Maudine Neese v. Commissioner.
Neese v. Commissioner
Docket No. 35402.
United States Tax Court
1953 Tax Ct. Memo LEXIS 116; 12 T.C.M. (CCH) 1058; T.C.M. (RIA) 53309; September 16, 1953
*116 George E. H. Goodner, Esq., 827 Munsey Building, Washington, D.C., and Dewey R. Roark, Jr., Esq., for the petitioner. Avery B. Cousins, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $10,980.51 in the income tax of the petitioner for the calendar year 1948. An adjustment disallowing a part of the deduction for depreciation claimed by the petitioner is no longer being contested by her. The remaining issues concern (1) whether gain realized by the petitioner from the sale of houses and lots in 1948 is taxable as ordinary income or capital gain; and (2) the determination of the amount of such gain. Findings of Fact Petitioner is an individual residing in Mobile, Alabama. Her income tax return for the calendar year 1948 was filed with the collector of internal revenue for the district of Alabama. Petitioner and Otto Neese were married in 1921 and have eight chidlren. Mr. Neese has been engaged in the retail lumber business, the wrecking and house demolition business, and the construction business. He is also a licensed real estate broker and is in the real estate business. He has bought tracts *117 of land and subdivided them into lots from 1926 until the present time. His construction work consisted primarily of building houses for himself for sale purposes, but he has also built houses for others. In March, 1943, a certain tract, known as "Cotton Mill Village" was offered for sale. This property, then belonging to a Mr. Sanders, the owner of a cotton mill, is located about six or seven blocks from the business center of Prichard, Alabama, a suburb of Mobile. It is a low rental property which had been occupied primarily by laborers in the cotton mill. The mill had been destroyed by fire and Sanders continued to rent the houses. Snug Harbor, Inc., the owner of a housing project adjacent to Cotton Mill Village, had an option to purchase the Cotton Mill Village land but did not want the houses thereon. Otto Neese, petitioner's husband, purchased such houses, 62 in number, at $125 each, for the purpose of wrecking them and using the lumber in his business. He made an oral agreement with Sanders to the effect that Sanders would continue to receive the rents from the houses as long as he owned the land and the houses remained thereon. Neese found that by reason of a housing shortage *118 Government restrictions prevented him from moving or destroying the houses. Sanders and Snug Harbor, Inc. suggested that he buy the land, as well as the houses. Neese suggested to petitioner, his wife, that it would be a good investment for her to purchase the land from Sanders and the houses from him, which he would undertake to repair so that they would be more suitable for occupancy. He offered to make the repairs and sell the houses to her, as repaired, for $600 each. Petitioner purchased the land upon which the Cotton Mill Village was situated, using for the purchase price a gift of $33,000 which she received from her husband. A gift tax return disclosing that gift was filed by her husband. Petitioner also purchased from her husband the 62 houses situated on the land paying him $600 for each house and the repairs. The houses were of frame construction without foundations, but standing on brick piers. They varied in size from three rooms to six rooms; most of the houses consisted of four rooms. To obtain the money needed to pay her husband for the houses and repairs, petitioner borrowed $40,000 from a Mobile bank. Mr. Neese signed the note and mortgage given by his wife for that *119 amount. The rents from the property were applied against this loan until it was paid. The total amount spent by petitioner for the land (including survey fees, grading fees and title insurance) was $35,383.47. The cost of the houses was $37,200. In addition, in December 1945, petitioner purchased for $300 a house and lot adjoining her property. The houses were occupied before they were repaired and in order to repair them it was necessary for them to be vacant. Neese repaired them, in accordance with his agreement, whenever vacancies occurred. It took about fourteen months to complete the repairs. After that time, there was no difficulty in keeping them rented. At times there were two families in one house. Prior to the time when petitioner acquired the Cotton Mill Village, it had never been subdivided into streets, lots, or blocks. The tract was described by metes and bounds and the houses were identified by number. After the petitioner acquired the property she had the property subdivided so that boundaries for each house were clearly set out. Streets and sidewalks were laid out and water lines were installed. There were then 139 lots and 62 houses in the village. The petitioner *120 employed a firm of real estate agents in Mobile to collect the rents and supervise the property. Requests by tenants for repairs were made to the agents, who placed an order with Neese to do the work. Work of that nature done by Neese for his wife was charged to her at his cost. Neese also handled some business dealings for his wife. He gave her advice, and some casual sales of property made by her prior to 1948 were made at his suggestion. Account books and records belonging to the petitioner were kept at his place of business. Petitioner made six sales of the village property from the time of her acquisition of the property in April 1943 up to the beginning of 1948. The property sold consisted of 2 houses, 4 complete lots, parts of 3 additional lots, and eight-tenths of an acre of land (sold as acreage). The first three sales were made in 1944 and related to outlying areas, two of which were never part of the subdivision. The fourth and fifth sales were made in 1945, one of them to a church, and the sixth sale was made in May 1946. These six sales were made on different occasions to different purchasers; each of such sales was made for a reason peculiar to the occasion. Both houses, *121 together with the three partial lots, were later repossessed by the petitioner. During the period from September 2, 1944, to January 6, 1945, inclusive, the Cotton Mill Village was advertised for sale in a Mobile newspaper of general circulation. The advertisement listing the property appeared 127 times and referred purchasers to the "Neese Lumber Company." During such period, petitioner was holding the property primarily for sale to customers in the ordinary course of her trade or business. In 1948, the petitioner made the following sales of houses and lots in Cotton Mill Village: Date
Sold
Selling price
Mar. 24
1 house and 2 lots
$ 4,700
July 13
3 houses and 4 lots
12,700
Aug. 13
8 lots
11,000 and 4
houses *
Sept. 16
1 house and 2 lots
6,500
All of the sales made during 1948, except the sale made on September 16, were made to the Board of School Commissioners of Mobile County, Alabama. The negotiations for such sales were initiated by the school board *122 and offers to purchase made by it were rejected by the petitioner. The petitioner sold the lots only after she was made cognizant of the power of the school board to condemn the lots and its intention to do so if she did not sell voluntarily. The houses on the lots sold to the school board were moved by the petitioner to other lots. The sale of lots to the school board included an undedicated street, title to which could revert at any time to the owner of the lots. The final sale in 1948 was made to one J. T. Taylor. Taylor was the owner of a lot in the village which was near the lots purchased by the school board. Taylor had acquired that lot for use as a garage from the Pentacostal Church which had purchased it in 1945 (in one of the six casual sales referred to above) from petitioner. Petitioner sold Taylor the house and two lots in 1948 in order to make his lot available to the school board. The Cotton Mill Village property was providing petitioner with a substantial income from rentals. During the taxable year 1948, petitioner was holding that property primarily as an investment and not for sale to customers in the ordinary course of trade or business. The cost basis of the *123 lots, together with the undedicated street appurtenant thereto, sold by petitioner during the year 1948 was $14,675. The fair market value of the four houses which petitioner received as part payment for the lots sold to the school board was $600 each, or $2,400. Petitioner realized a gain of $20,334.95 from the sale of houses and lots in 1948, computed as follows: Cash received
$34,900
Houses received
2,400
Total received
$37,300.00
Cost basis of lots sold
$14,675.00
Costs basis of
houses sold
$3,000.00
Less deprecia-
tion
709.95
Basis of houses sold
2,290.05
Total basis of property sold
16,965.05
Gain realized
$20,334.95
Opinion RAUM, Judge: 1. Whether the profit realized by petitioner from the sale of houses and lots in 1948 was ordinary income rather than capital gain depends upon whether the property was "held by the taxpayer primarily for sale to customers in the ordinary course of [her] * * * trade or business." Section 117 (a), (j) (1), Internal Revenue Code. The question is essentially one of fact. Rubino v. Commissioner, 186 Fed. (2d) 304 (C.A. 9); King v. Commissioner, 189 Fed. (2d) 122, 124 *124 (C.A. 5); Mauldin v. Commissioner, 195 Fed. (2d) 714, 716 (C.A. 10). It is true that within a year and several months after petitioner acquired the property, the houses and lots were offered for sale in an advertisement which appeared in a newspaper for 127 successive days, from September 2, 1944 to January 6, 1945, inclusive. During that period, it seems clear, the property was held for sale. However, the sales here in question occurred in 1948, and we are satisfied from a study of the entire record that the property was not held for sale in 1948. And the crucial consideration on this issue is the petitioner's intention in holding the property during the taxable year. Cf. Carl Marks & Co., 12 T.C. 1196, 1202. The advertisement in question appeared for the last time on January 6, 1945. There is no evidence that there were any subsequent advertisements, or that petitioner thereafter in any way attempted to sell the houses and lots. The few sales that did occur appear to have been brought about by special circumstances, and were in no way consummated by petitioner in carrying on a trade or business. The profits obtainable from rental of the houses were *125 substantial, and we think that, long before 1948, petitioner had decided to retain the property as an investment rather than to sell it. The very sales that petitioner made in 1948 were of such character that they do not support the Government's contention that the property was held for sale. All of the sales except one were made to the school board. These sales were initiated by the board itself, and petitioner at first even refused to sell. She agreed to sell only under threat of condemnation. The only other sale in 1948, to J. T. Taylor, was made to facilitate the school board's purchase of certain land in the immediate vicinity owned by Taylor. We are convinced that the property was not held by petitioner for sale in trade or business during 1948. Therefore, the profit realized by her was capital gain rather than ordinary income. 2. The amount of the profit which petitioner realized is also in dispute. The resolution of this issue depends upon two factors: (1) an allocation of the total cost of the land to the individual lots; and (2) a valuation of the four houses which petitioner received back from the school board. The petitioner introduced an allocation of the cost of the *126 land among the individual lots which was made by an independent real estate appraiser familiar with land value in the Mobile area. In his testimony, he explained his reason for allocating the highest portion of the cost to the lots sold by the petitioner. The Commissioner introduced a percentage allocation made by a valuation expert in the Bureau of Internal Revenue. He, too, agreed that the lots sold by the petitioner were in the area with the highest value. The Commissioner's position, however, is based on an equal allocation of cost in that area. We think that such an allocation is in error. Petitioner's witness pointed out the various factors which make some lots worth more than others and according to the testimony, the lots sold by the petitioner had a higher value than others in the same area, as outlined by the respondent. We find the testimony of petitioner's witness persuasive, and we accept his allocation of cost for the lots which were sold during the taxable year. Pursuant to that allocation, the lots sold in 1948 had a basis of $14,675. We cannot agree with petitioner on her valuation of the four houses which she received back from the school board. The Commissioner *127 contends that the houses had a fair market value at that time of $600 each. Petitioner argues that because the houses had to be moved (at a cost of approximately $300) and repair work would be necessary, their value was only $200 each. Petitioner, however, has failed to explain the higher value allocated to the houses (about $3,000 each) when sold by her to the school board, and the value ($4,000) her witness gave to the house sold to J. T. Taylor. Petitioner has failed to sustain her burden of disproving the Commissioner's valuation of those houses. Based on the foregoing we have determined that petitioner's gain from the sale of houses and lots in 1948 was $20,334.95. Decision will be entered under Rule 50. Footnotes
*. The four houses which petitioner received as part of the purchase price for the eight lots sold on August 13, were the same four houses which petitioner sold on March 24 and July 13.↩